Sun Drug Company, Inc., Appellant, *v.* West
Penn Realty Company et al., Appellant.

454

Argued November 22, 1968; reargued January 7, 1970. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Harold Gondelman,* with him *Baskin, Boreman, Sachs, Gondelman & Craig,* for defendants.

*Frank J. Gaffney,* with him *Louis Caplan,* and *Thorp, Reed & Armstrong,* for defendant.

*William T. Marsh,* with him *Reed, Smith, Shaw & McClay,* for plaintiff.

OPINION PER CURIAM: July 13, 1970:

In appeals Nos. 4, 5 and 22 March Term, 1969, the decree of the court below (at No. 976 January Term, 1967 of the Court of Common Pleas of Allegheny County) is affirmed by an equally divided court.

In appeals Nos. 6 and 7 March Term, 1969, the decree of the court below (at No. 977 January Term, 1967 of the Court of Common Pleas of Allegheny County) is reversed. The appeal at No. 23 March Term, 1969 is dismissed.

In appeals Nos. 8, 9 and 24 March Term, 1969, the decree of the court below (at No. 978 January Term, 1967 of the Court of Common Pleas of Allegheny County) is affirmed by an equally divided court. Each party to bear own costs.

Mr. Justice POMEROY took no part in the consideration or decision of this case.

---

OPINION IN SUPPORT OF ORDERS BY MR. JUSTICE ROBERTS:

I believe that these contractual provisions are not restrictive covenants which must be strictly construed. As I said in my dissent in *Great A. & P. Co. v. Bailey,* 421 Pa. 540, 547, 220 A. 2d 1, 4 (1966):

"It should be noted that we are not here faced with a challenge to the *validity* of the covenant. It is recognized and accepted that such covenants are valid and enforceable in this Commonwealth so long as they do not result in an unreasonable restraint of trade. See Hoffman v. Rittenhouse, 413 Pa. 587, 198 A. 2d 543 (1964); Cleaver v. Lenhart, 182 Pa. 285, 37 Atl. 811 (1897). There is no contention or suggestion that the present covenant, even if interpreted as urged by A & P, would work such an unreasonable restraint; the present restriction cannot be said to be greater than is required for the protection of the one for whose bene-

fit it was imposed or to cause an undue hardship upon the person restricted. See Restatement, Contracts, §515 (1932) ; cf. Harris Calorific Co. v. Marra, 345 Pa. 464, 29 A. 2d 64 (1942). Thus the sole issue before this Court is whether the covenant was intended by the parties and should be construed to bind after acquired property adjacent to and made part of the shopping center.

"In considering the proper approach to the construction of a restrictive covenant in a commercial context, it is increasingly recognized that 'parties are entitled to a degree of freedom in contracting to protect their own economic interests and that [the] controlled development of a given business center may be desirable. . . .' " 421 Pa. at 549-50, 220 A. 2d at 5.[1]

Feeling as I do that we should not construe lease provisions such as the instant one with any unusual parsimony, I believe that Sun is entitled to protection from Sterling's competition in two of the three instances now present before this Court. In construing these leases, the touchstones of interpretation ought to be the similarity of the businesses from the point of view of the consumers and the extent to which customary business practice would consider the two operations to be coextensive. Using these standards, I think it clear that the provisions of the North Hills Village lease and the Eastland Shopping Center lease were meant to and do exclude competition from an operation such as Sterling's.

The North Hills lease provides that the lessor shall not lease any of its other stores "for use as a drug store, with or without a prescription department," and the evidence is that the products which Sterling's North Hills store handles account for at least three-quarters

---

[1] Note, *Restrictive Covenants in Shopping Center Leases*, 34 N. Y. U. L. Rev. 940 (1959).

of Sun's North Hills store's business. I am at a loss to understand what type of business could more accurately be termed a "drug store without a prescription department." Further, I do not believe that the next sentence in the North Hills lease—allowing other tenants to carry "many" of the same products carried by Sun—eviscerates the clear meaning of the restriction. Sun clearly intended to permit some overlapping in the sale of its items, but I cannot believe that the ends of justice are served by reading the clause so as to nullify the protection sought by and given to Sun in the preceding sentence.

The Eastland Shopping Center lease provides that no other store may be used as "a drug store or a proprietary medicine store," and the evidence demonstrated that Sterling's Eastland store sold products which accounted for two-thirds of the Eastland Sun's sales. I again fail to see how Sun could more clearly be protected. I also note that my brethren's diversionary discussion of the possibility of shifting definitions of what a "drug store" is and of the virtues of free trade does not really answer the question whether Sun's Eastland lease protected it against Sterling's competition. I, too, am in favor of free trade and I, too, believe that shifting definitions might, in some contexts, be a problem;[2] but I do not see how either issue is relevant in this case. No one has asserted that Sun's business has changed substantially since this lease was written, and there is no doubt that this restriction is not an illegal restraint on trade. I would encourage my colleagues to eschew obfuscation and face the issues involved.

---

[2] Of course, this problem could be taken care of by simply defining Sun's business for the purposes of interpreting the restriction as that which they conducted at the time the lease was written.

The Banksville lease presents a more difficult problem. That lease provides that no property is to be leased to a store engaged in a "retail drug business such as that of [Sun]," and the evidence is that only forty-one per cent of Sun's Banksville sales is from products which Sterling's Banksville store also carries. I feel that Sun probably intended to insulate itself from the competition of a store such as Sterling's, but I agree with the majority that this lease provision is too ambiguous to support such a conclusion. At the very most, this lease provision covers only situations in which more than fifty per cent of Sun's sales is derived from products similar to those carried by the competing establishment.

I would reverse the decree as to the Banksville store and affirm as to the two others.

Mr. Chief Justice BELL joins in this opinion.

---

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE COHEN:

In this case we are called upon to construe three restrictive covenants—one in each of three leases—by which plaintiff, Sun Drug Company, Inc. (Sun) rented storerooms in various shopping centers near Pittsburgh. By a written lease of October 27, 1961, Sun rented a storeroom in the Eastland Shopping Center. Paragraph 8 of the lease provides in part: "During the term of this Lease, or any renewal or extension hereof, Landlord will not let or permit any Storeroom in the Shopping Center, or any other land controlled by landlord, either directly or indirectly, within a radius of one (1) mile of the Shopping Center to be used or occupied *as a drug store or a proprietary medicine store.*" (Emphasis supplied) By written lease dated February 4, 1965, defendant, West Penn Realty Co. (West Penn) leased to defendant, Sterling Centers, Inc. (Sterling)

a storeroom in the Eastland Shopping Center for the purpose of the "retail sale of home beauty products, sundries." Prior to the signing of its lease, Sterling had notice of Sun's lease.

By written lease dated November 29, 1954, Sun rented a storeroom in the North Hills Village Shopping Center. That lease contains the following provision: "The Lessor agrees that it will not lease another storeroom in the shopping center of which the demised premises are a part for use *as a drug store, with or without a prescription department. However, it is understood that other tenants in the shopping center may have for sale many of the items being sold by this Lessee.*" (Emphasis supplied)

West Penn, by written lease dated March 17, 1966, leased to defendant, Sterling Centers #2, Inc. (Sterling #2), a storeroom in the shopping center for the purpose of "Retail sale of home beauty products and sundries." Sterling #2 had notice of Sun's lease prior to the signing of its lease.

On August 29, 1956, Sun leased from defendant, Banksville, Inc. a storeroom in the Banksville Shopping Center. Paragraph 17 of that lease provides: "Lessor, its assigns and successors in title, during the term of this lease or any renewal thereof, will not lease, rent, occupy or permit to be occupied, or sell without a covenant prohibiting such use or occupancy, any premises within the Banksville Plaza Shopping Center, as a store *for retail drug business such as that of Tenant.*" (Emphasis supplied) By written lease dated August 2, 1966, Banksville, Inc. leased to Sterling Centers #3, Inc. (Sterling #3) a storeroom in the Banksville Plaza Shopping Center for use "for the sale of health and beauty aids and related items, except as follows: A. Prescription drugs and prescription medicines; B. Cigars, cigarettes and tobacco; C. Soda fountain and lunch counter; and D. Greeting cards."

Sun now alleges that the actions of defendants, Sterling, Sterling #2 and Sterling #3, in operating what the lower court found to be "drug" stores violated its rights under the above leases and that it is entitled to injunctive relief and damages. It makes the same claims and asks for injunctive relief and damages against defendants, West Penn and Banksville, Inc.

The lower court found that at Eastland, Sterling operated a proprietary medicine store within the meaning of Sun's lease; that at Banksville Plaza, Sterling #3 operated a retail drug business such as that of Sun within the meaning of Sun's lease; and that at North Hills, Sterling #2 operated a drug store without a prescription department within the meaning of Sun's lease. The chancellor did not award damages because Sun's proof was not specific enough in showing changing customer patterns; Sun proved only sales erosion, and this was not a sufficiently precise base upon which to render a fair money award.

Defendants Sterling would have this Court reverse the decision of the court below by holding restrictive covenants whose purpose is the restraint of trade invalid as against public policy. I would not so hold because the showing of harm to the public is not so clear and conclusive as to outbalance the interests of parties in contracting as they wish. This does not mean that all restrictive covenants in restraint of trade are valid. Such covenants are valid if reasonable, i.e., limited in space, time and in scope to the extent required for the protection of the party for whose benefits the covenant was made. *Great A. & P. Tea Co. v. Bailey,* 421 Pa. 540, 220 A. 2d 1 (1966) ; Restatement, Contracts, §§515, 516 (1932). In that way the interests of the public and individual contracting parties are put in proper balance.

In terms of time and space, these covenants appear reasonable. All are for the term of the lease, and two

restrict only that particular shopping center, while one covers a radius of one mile. If the defendants are to prevail, it will have to be upon other grounds.

In order to determine Sun's rights, it is necessary to construe carefully each restrictive covenant.

"It is a general rule of contract interpretation that the intention of the parties at the time the contract is entered into governs: Heidt v. Aughenbaugh Coal Co., 406 Pa. 188, 176 A. 2d 400 (1962). This same rule also holds true in the interpretation of restrictive covenants: Baederwood, Inc. v. Moyer, 370 Pa. 35, 87 A. 2d 246 (1952), and McCandless v. Burns, 377 Pa. 18, 104 A. 2d 123 (1954). However, in Pennsylvania, there is an important difference in the rule of interpretation as applied to restrictive covenants on the use of land. It is this. Land use restrictions are not favored in the law, are strictly construed, and nothing will be deemed a violation of such a restriction that is not in *plain disregard of its express words." Great A. & P. Tea Co. v. Bailey,* supra at 544. (Emphasis supplied). Thus, the court can not enlarge a restriction by implication and can not save the draftsman from any ambiguity he has created for the restriction must be construed most strictly against the one asserting rights under it. *Jones v. Park Lane For Convalescents,* 384 Pa. 268, 272, 120 A. 2d 535 (1956).

## I.

Considering first the Banksville Plaza lease, the key words are "as a store for retail drug business such as that of Tenant." Sun must prove that Sterling #3 was a "retail drug business" and that it was "such as that of Tenant." Certainly Sterling #3 can not avoid the lease's effect just by calling itself a "health and beauty aid" store. This Court will not permit labels to obscure what substantive rights may be involved.

However, in the case of this lease, it is not necessary to decide if Sterling #3 was a "retail drug business" because it appears that the latter's business was not "such as that of Tenant."

Sterling #3's lease prohibited the operation of a prescription department, lunch counter and soda fountain and the sale of greeting cards and tobacco products. These activities in which Sun engaged and Sterling #3 did not accounted for 58.50% of Sun's sales at the Banksville store. Thus only 41.50% of Sun's sales were from products which Sterling #3 carried. When more than half of Sun's sales came from sales and operations in which Sterling #3 did not indulge, it is difficult to see how the latter's business was "such as that of Tenant." It is true that by excluding tobacco products, prescription drugs and fountain service, Sterling #3 carries 80% of the product lines sold by Sun, but when construing the "such as that of Tenant" phrase, there seems no reason to exclude those products and services. If Sun had desired a particular method of construing that phrase, it should have said so explicitly in the lease. In the absence of such a direction, this Court must make a natural and reasonable construction, and the percentages of sales figures discussed seem the most revelant ones for that purpose.

## II.

Considering next the North Hills Village lease, the key words are "for use as a drug store, with or without a prescription department." If this were all that appeared, it would be necessary to determine whether Sterling #2 were a drug store. However, a sentence appears after these words which casts great doubt on the meaning of the whole paragraph. The lease says "However, it is understood that other tenants in the shopping center may have for sale *many* of the items

being sold by this Lessee." It is not clear whether this meant that many other tenants could have a few items each or whether one or more could carry many items that Sun sold. The lower court found that Sun's North Hills store sold all the products Sterling #2 did, and that these accounted for approximately three-fourths of Sun's business. Consequently, a full one-fourth of its business comes from products Sterling #2 does not handle.

The question, therefore, is whether three-fourths is the "many" recognized in the lease. Certainly "many" can not mean 100%, for then "all" would have been used. But at what point below 100% does "many" become applicable? There is no absolute answer to that question, and under the principles of construction of restraints on trade previously discussed, the matter must be determined against the party relying on the restraint. If it is argued that such an interpretation makes the clause meaningless while another reading (perhaps 20-30%) might make more sense as far as Sun is concerned, it must be remembered that in construing these restrictions "nothing will be deemed a violation of such a restriction that is not in *plain disregard of its express words*." (Emphasis supplied) *Great A. & P. Tea Co. v. Bailey,* supra at 544. Sun must bear the consequences of the ambiguity it has created and can not rely on this Court to redraft its agreement in a way more favorable to it.

### III.

With respect to the Eastland Shopping Center, the crucial part of clause 8 is "to be used or occupied as a drug store or a proprietary medicine store." The lower court found that Sun's Eastland store sold all the products Sterling did, and that these accounted for approximately two-thirds of Sun's business. I do not

wish to indulge in problems of semantics by trying to define precisely what is a "drug store" or "proprietary medicine store." To attempt such a definition would be pointless because the type of operation Sun, Sterling and other such companies run changes over time to meet new consumer wants and needs. To announce a definition based on type of product sold today (if a definition were to be written, only one on such a functional basis would make sense) would only produce confusion and uncertainty tomorrow as these companies altered the types of products sold and their general manner of merchandising to meet pressures of competition. In his testimony, Frank Adams, General Manager and Vice-President of Sun, recognized as much when he testified he would consider as a "drugstore item" anything the public accepted as sold at Sun and in which Sun's sales were comparable to other sellers of the item. It is certainly conceivable that by expanding clothing, toy, appliance and other presently operated departments, Sun in the next few years could become what is today referred to as a "junior department store" and then claim protection under clause 8 against other "junior department stores" on the theory that Sun only operated a "drug" store.

It must also be remembered that the United States and this Commonwealth strongly support the policy of free competition. In *Sears, Roebuck and Co. v. Stiffel*, 376 U.S. 225 (1964) and *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234 (1964), the Supreme Court emphasized the great public interest in having access to all goods. It stated that restraints on this access were narrowly drawn and even then existed only because of important competing policy consideration (e.g., encouragement of invention). Even though the specific subjects of those cases were patent law and unfair competition, what is important in this context

is the emphasis on unfettered competition as the general rule with restraints being narrowly construed and existing only to promote specific policy objectives. In *Gulf Oil Corporation v. Mays,* 401 Pa. 413, 418, 164 A. 2d 656 (1960), we referred to "our basic anti-monopoly philosophy of unfettered competition in the market of goods and services."

Also, with shopping centers playing an increasingly large role in the commercial life of this country, it is important to note the different type of competition that exists in a "downtown" shopping area as compared to a shopping center. It is very rare for one individual or corporation to own a significant part of a "downtown" shopping area, and therefore there is no one party who can determine how many of a given type of store can exist. The success or failure of any one store will depend on the dollar "votes" cast by the consumer. In addition, it is very easy for a customer to get from one store to its competitor. In a shopping center the situation is quite different. The promoter of the center, acting under pressures from his major tenants, can restrict the number of a given type of store. Also, when a customer comes to a shopping center, it is generally by automobile, and while not terribly difficult, it is certainly inconvenient for that customer to go to another shopping center, which may be several miles away, in order to patronize a competitor of a store owner in the first center. The tendency of the customer is to go to one shopping center and complete all his business there. Thus, given that free and unfettered competition is our general policy, with respect to shopping centers the concept of competition *within* a given center is of central importance. Therefore, in order for a restrictive covenant as to a shopping center to be enforceable, it must be drawn with great particularity and precision.

It is now necessary to construe clause 8 in the light of these principles. It seems clear from the testimony that the operation of a successful Sun or Sterling store involves two elements—the stocking of products the consumer desires and the merchandising of those products in a way that will attract customers. It also seems clear from the testimony that a revolution has occurred as concerns merchandising in what might be called the "health and beauty aid" field in the last few years. Apparently Sun, under pressure from its competitors, decided to institute a discount pricing policy and to emphasize the words "health and beauty aids." Thus, the seemingly clear words "as a drug store or a proprietary medicine store" are actually quite ambiguous because the dynamics of retail merchandising make the "drug store" of 1961 obsolete. Given the rule of strict construction of restrictive covenants and the policy of favoring open competition, this Court should not grant a favored position to Sun. That is, we should not take an undefined (actually undefineable) and ambiguous term such as "drug store" as a basis for protecting Sun when that term changes meaning constantly. If Sun desires rights of this nature, it should have to specify them more particularly as this Court should not rewrite its agreement for it.

I would reverse each of the three decrees.

Mr. Justice JONES and Mr. Justice O'BRIEN join in this opinion.