

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-24-1996

# JC Penney Co Inc v. Giant Eagle Inc

Precedential or Non-Precedential:

Docket 95-3054

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"JC Penney Co Inc v. Giant Eagle Inc" (1996). *1996 Decisions*. Paper 183.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/183

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 95-3054
_____


J. C. PENNEY COMPANY, INC.,

                              Appellee

            v.

GIANT EAGLE, INC.; GIANT EAGLE MARKETS,
INC., and STANLEY R. GUMBERG, individually
and as Trustee under those certain
Irrevocable Deeds of Trust dated May 9,
1969,

                  GIANT EAGLE, INC.,
                              Appellant


_____

On Appeal From the United States District Court
    For The Western District Of Pennsylvania
         (D.C. Civil No. 92-cv-01769)
_____


            Argued:  October 27, 1995

 Before:  STAPLETON, McKEE, Circuit Judges, and
          JOHN R. GIBSON, Senior Circuit Judge

          (Filed May 24, 1996)

                  RALPH A. FINIZIO, ESQ.
                   (argued)
                  Houston Harbaugh
                  Two Chatham Center
                  12th Floor
                  Pittsburgh, PA 15219

                  Attorney for Appellee

                  BERNARD D. MARCUS, ESQ.
                  DAVID B. RODES, ESQ.

                         (argued)
                         Marcus & Shapira
                         One Oxford Centre
                         35th Floor
                         Pittsburgh, PA 15219
                         Attorney for Appellant



                    _____

                      OPINION OF THE COURT
                    _____


JOHN R. GIBSON, Senior Circuit Judge:

        Giant Eagle, Inc. appeals from an order of the district
court enjoining it from operating a pharmacy in its Quaker Village
shopping center store for the duration of J. C. Penney Company's
1978 lease, including renewals.  Giant Eagle argues that Penney's
exclusive right to operate a pharmacy in Quaker Village ended when
Penney's 1962 lease ended, and that Penney's exclusive right is
unenforceable against it because it did not have notice of Penney's
exclusive right.  We affirm.

        In 1962 the Thrift Drug Company leased a store in the
Quaker Village shopping center to operate a retail drugstore.  The
lease required that Thrift Drug use the premises only for operation
of a retail drugstore, and gave it the right to display "such
articles as are displayed and sold by it in its other retail drug
stores."  The lease further provided that the owner of Quaker
Village, as lessor, would not permit another tenant to operate a
pharmacy or fill or sell prescriptions.  The lease covenanted that
other tenants would be Thorofare Markets, Inc., which would operate
a supermarket, and Triple "A", a national chain variety store.
These tenants were allowed to sell merchandise customarily sold in
drugstores, provided that they did not compound or sell
prescriptions, or sell merchandise limited by state law to licensed
pharmacies.  The lease was for a term of fifteen years, and Thrift
Drug was given the right to renew and extend the lease for three
additional five-year terms.  Thrift Drug recorded a memorandum of
the lease which set forth a description of the premises, the term
of the lease, and Thrift Drug's right to renew, but made no mention
of Thrift Drug's obligation to operate only a retail drugstore, nor
of the shopping center's agreement prohibiting other tenants from
operating a drugstore.  In 1969 Penney acquired Thrift Drug and all
of its rights, including the 1962 lease.

        In 1977 Giant Eagle entered into a lease at Quaker
Village, which provided that it was to operate a food and grocery
supermarket for items "customarily sold in the markets which it
operates in the Greater Pittsburgh area."  Giant Eagle's lease also
gave Giant Eagle the exclusive right to operate a grocery store in
Quaker Village with the exception of the existing Thorofare store.

Stanley R. Gumberg, the owner of the Quaker Village shopping center, negotiated the lease with Giant Eagle, and stated that there was no reference to a pharmacy or drugstore in the lease provision describing Giant Eagle's use of the premises. He also stated that at the time the lease was negotiated there was no thought or discussion of a pharmacy in Giant Eagle's store.

In 1975 Penney began discussing with Gumberg the possibility of relocating its drugstore within Quaker Village. Throughout these discussions, Penney insisted on keeping its exclusive right to operate a pharmacy. In 1978 Penney and Gumberg agreed that Penney would relocate its drugstore within the shopping center and continue to have the exclusive right to operate a pharmacy. The 1978 lease gave Penney the exclusive right to operate a pharmacy in Quaker Village, and provided that the 1962 lease was to terminate one day after the new lease term started, thus providing an overlap between the 1962 and 1978 leases. The 1978 lease also covenanted that Giant Eagle was to operate a supermarket in the shopping center, which was a condition for Penney operating its new drugstore.

In 1990 Giant Eagle began to make plans to expand its supermarket in Quaker Village to include a pharmacy. To accommodate Giant Eagle's plans, Gumberg asked Penney several times to waive its exclusive right to operate a pharmacy in the shopping center. Penney consistently refused to waive its exclusive right. Gumberg told Giant Eagle that Penney had the exclusive right to operate a pharmacy in Quaker Village and that Penney refused to waive that right. Despite this information, Giant Eagle began its construction of a pharmacy at its Quaker Village store. Shortly thereafter Penney told Giant Eagle and Gumberg that it intended to enforce its exclusive right. On August 13, 1992 Giant Eagle opened its pharmacy in Quaker Village, and Penney sued Giant Eagle to enjoin Giant Eagle's operation of the pharmacy.

The district court granted Penney a preliminary injunction. J. C. Penney Co. v. Giant Eagle, Inc., 813 F. Supp. 360 (W.D. Pa. 1992). Giant Eagle appealed the preliminary injunction to this court, and we affirmed the injunction in an unpublished opinion. J. C. Penney Co. v. Giant Eagle, Inc., 995 F.2d 217 (3d Cir. 1993). The district court later granted Penney a permanent injunction against Giant Eagle for the duration of Penney's 1978 lease, including renewals. In granting the permanent injunction, the district court stated that under Penney's 1962 and 1978 leases Penney continuously held the exclusive right to operate a pharmacy in Quaker Village. The court also stated that Penney could enforce its exclusive right against Giant Eagle because the memorandum of the 1962 lease, which was filed for record, gave Giant Eagle constructive notice of Penney's exclusive right when Giant Eagle entered into its Quaker Village lease. Giant Eagle appeals from the district court's grant of the permanent injunction.

I.

Giant Eagle argues that Penney cannot enforce its exclusive right against Giant Eagle because Giant Eagle obtained

its lease in Quaker Village before Penney obtained its 1978 lease containing the exclusive right.  Giant Eagle argues that the 1978 lease did not preserve Penney's 1962 exclusive right for two reasons.  First, Giant Eagle argues that Penney cancelled its 1962 lease and filed for record a lease cancellation agreement stating that the 1962 lease was null and void.  Therefore, Giant Eagle argues, Penney cannot rely on an exclusive right contained in a lease which is null and void.  Second, Giant Eagle argues that Penney's exclusive right is a form of restrictive covenant or negative easement which cannot be transferred from one location within Quaker Village to another.  Giant Eagle concludes that because Penney moved in 1978, it could not take its exclusive right with it.

A.

In this diversity case, we must determine and apply Pennsylvania law, and when the issues have not been authoritatively determined by the Pennsylvania Supreme Court, we must predict how it would decide those issues.  Adams v. Madison Realty & Dev., Inc., 853 F.2d 163, 168 (3d Cir. 1988).  Our review is de novo without deference to the district court.  Salve Regina College v. Russell, 499 U.S. 225 (1991).

For many years the Pennsylvania Supreme Court used principles of real estate law in interpreting restrictions in shopping center leases.  In Siciliano v. Misler, 160 A.2d 422 (Pa. 1960), the court stated, "In restricting real estate a scrivener acts at his peril:  if his creation is not self-sustaining it is nothing."  Id. at 425.  The court rejected the argument that the intent of the parties should govern.  Instead, it looked at the plain language of the restriction, gleaning the intent of the parties from the language alone.  Id.  See also Food Fair Stores, Inc. v. Kline, 152 A.2d 661, 663 (Pa. 1959).

There were early rumblings of change in Great Atlantic & Pacific Tea Co. v. Bailey, 220 A.2d 1 (Pa. 1966), which did not produce a majority opinion.  See Mt. Lebanon v. County Bd. of Elections, 368 A.2d 648, 650-51 (Pa. 1977) (non-majority opinions of the Pennsylvania Supreme Court are non-decisional); Vargus v. Pitman Mfg. Co., 675 F.2d 73, 74-75 (3d Cir. 1982) (a majority of the justices on the Pennsylvania Supreme Court must join an opinion in its entirety or it is not binding precedent).  In Great Atlantic & Pacific Tea Co., the Baileys, owners of a shopping center, granted A & P the exclusive right to operate a grocery store in their shopping center.  220 A.2d at 1-2.  Later, the Baileys purchased land next to their shopping center and rented it to another grocery store operator.  Id. at 2.  A & P, relying on its exclusive right, sued to prevent the operation of the competing grocery store.  Justice Eagen, with two justices joining his opinion and another only concurring in the result, wrote that courts must strictly construe exclusive rights granted in shopping center leases, because they restrict the use of land and such restrictions are traditionally not favored.  Id. at 2-3.  Following this reasoning, Justice Eagen concluded that A & P could not enforce its exclusive right against land acquired after its lease because A & P's exclusive right did not state explicitly that it

applied to after-acquired land.  Id. at 3.

Justice Roberts, joined by two other justices, dissented in Great Atlantic & Pacific Tea Co.  Id. at 4.  Justice Roberts stated that exclusive rights are important for the development of modern shopping centers and that the modern approach was to realistically interpret the exclusive right so as to give effect to the intent of the parties.  Id. at 5-6 (citing Cragmere Holding Corp. v. Socony-Mobil Oil Co., 167 A.2d 825, 827 (N.J. Super. Ct. App. Div. 1961) and other cases).  Justice Roberts rejected the uncritical application of the doctrine of strict construction to defeat the obvious purpose for which a covenant was included in a lease agreement.  In ascertaining the intention of the parties, he wrote, the restriction should be interpreted in light of the apparent purpose of the covenant and the conditions existing at the time the lease agreement was executed.  Id. at 6.  After considering the circumstances surrounding execution of the lease, Justice Roberts concluded that the parties intended for A & P to be the only grocery store in the shopping center and that A & P could enforce its exclusive right against land added to the shopping center after A & P's lease.  Id. at 6-7.  In essence, Justice Roberts was arguing for the use of contract law, rather than the real estate law governing land use restrictions.

Shortly after Great Atlantic & Pacific Tea Co., the Pennsylvania Supreme Court, with one justice not participating, evenly split over the interpretation of exclusive rights in shopping center leases.  Sun Drug Co. v. West Penn Realty Co., 268 A.2d 781 (Pa. 1970).  Again, three justices argued that exclusive rights should be strictly interpreted because they restricted the use of land.  Id. at 783.  Justice Roberts continued to state that exclusive rights contained in shopping center leases should be realistically interpreted so as to give effect to the intent of the parties to the lease.  Id. at 785-86.

Exclusive rights in the shopping center lease context were again considered by the Pennsylvania Supreme Court in Teodori v. Werner, 415 A.2d 31 (Pa. 1980).  The issue in Teodori was whether a tenant had an independent continuing obligation to pay rent when the landlord violated the tenant's exclusive right to sell jewelry.  Justice Roberts wrote the court's unanimous opinion. He recognized that the old common law of landlord and tenant relations based on real estate principles would recognize the independent obligation of the tenant to continue paying rent even though the landlord had violated the tenant's exclusive right. Teodori, 415 A.2d at 33.  Justice Roberts began his discussion by stating:  "It is now clear, however, that this view of landlord-tenant relations, incorrectly resting more on notions of property law than on principles of contracts, has no place in modern jurisprudence."  Id.  The court continued that the independent obligation approach must be rejected where the landlord breaks a promise in the lease which "is a significant inducement to the making of the lease by the tenant."  Id. at 34 (quoting Restatement (Second) of Property, Introductory Note to Chapter 7 (1977)).  The opinion continues:

It is obvious that a landlord's non-competition promise is critical to a

> commercial lease agreement like the one here.
> "The mere presence in a lease of a
> noncompetition promise by the landlord
> justifies the conclusion that it is essential
> that the promise be observed if the tenant is
> to conduct his business on the leased property
> profitably."

Id. (quoting Restatement (Second) of Property  7.2 cmt. b (1977)). In a lengthy footnote the court reiterated the importance of exclusive rights in shopping center leases in assuring the mix of quality businesses essential to a shopping center's financial success. Id. at 34 n.5 (citing Cragmere Holding Corp. v. Socony-Mobil Oil Co., 167 A.2d 825 (N.J. Super. Ct. App. Div. 1961)).

Teodori represents a substantial change in the Pennsylvania Supreme Court's approach to shopping center leases with exclusive rights. Although the court's holding is limited to the independent obligation for the tenant's payment of rent, the court applied contract-law principles for determining the intent of the parties and rejected the strict approach of real estate law, which had been the law of Pennsylvania. See also Cimina v. Bronich, 537 A.2d 1355, 1358 (Pa. 1988) ("[A] lease is in the nature of a contract and is controlled by principles of contract law.") (citing Amoco Oil Co. v. Snyder, 478 A.2d 795 (Pa. 1984), and Ezy Parks v. Larson, 454 A.2d 928 (Pa. 1982)); Pugh v. Holmes, 405 A.2d 897, 903 (Pa. 1979) (same). Teodori completed what Justice Roberts had argued for in Great Atlantic & Pacific Tea Co., and Justice Eagen's joining in Justice Roberts's Teodori opinion demonstrates the abandonment of the strict approach to exclusive rights which Justice Eagen adhered to in his Great Atlantic & Pacific Tea Co. plurality opinion.

Accordingly, we must analyze the relationships in this case under the rules announced in Teodori.

B.

Penney is attempting to enforce against Giant Eagle its exclusive right to operate a pharmacy in Quaker Village contained in its 1978 lease, and thus, we must examine the terms of the lease and the circumstances surrounding the lease. Sun Drug Co., 268 A.2d at 785-87 (Roberts, J., opinion in support of orders); Great Atl. & Pac. Tea Co., 220 A.2d at 5-6 (Roberts, J., dissenting).

In so doing, we begin with Giant Eagle's 1977 lease, because Gumberg negotiated this lease at the same time he negotiated Penney's 1978 lease. Giant Eagle's lease stated that Giant Eagle "shall use the [rented] premises as a food and grocery supermarket for the sale of items customarily sold" in other Giant Eagle supermarkets in the greater Pittsburgh area. Giant Eagle's lease also gave Giant Eagle, with one exception, the exclusive right to operate a grocery store in the Quaker Village shopping center. Gumberg testified that he did not in any way contemplate giving Giant Eagle the right to operate a pharmacy. Joseph Faccenda, Giant Eagle's Vice President, also testified that there were no pharmacies in any of Giant Eagle's stores in 1977. This

testimony, coupled with the clear language of Giant Eagle's lease, shows that Gumberg intended to give Giant Eagle the exclusive right to operate only a supermarket in Quaker Village.

The negotiations behind the 1978 lease between Gumberg and Penney, on the other hand, show that Gumberg intended to grant Penney an exclusive right to operate a pharmacy. Throughout the negotiations concerning the move of its drugstore within Quaker Village, which began in the fall of 1975, Penney insisted on preserving its exclusive right from the 1962 lease, and insisted that the transaction be structured so as to maintain continuity with the 1962 lease. When Gumberg submitted one draft of a lease to Penney that did not contain the exclusive right, Penney's representatives promptly insisted that the exclusive right be included in the lease. Penney agreed to move on the condition that its exclusive right remain in full force. As a result, the lease not only contained the exclusive right Penney wanted, it also provided that the 1962 lease would terminate one day after the start of the 1978 lease. This overlap ensured the continuity in Penney's tenancy and exclusive pharmacy right. Gumberg testified that Penney's 1978 lease gave Penney the exclusive right to operate a pharmacy in the Quaker Village shopping center.

The terms of the 1978 lease are entirely consistent with the parties' intent to grant Penney an exclusive pharmacy right. The lease stated that during the term of the lease Gumberg would "not use or occupy, or permit the use or occupancy of, any space" other than Penney's for "the operation of a drug store, or a drug department, in which a registered pharmacist is in attendance or required by law to be in attendance for any period of time," nor would Gumberg enter into any lease which would permit another tenant or sub-tenant to use space in Quaker Village for such purposes. The exclusive right provision concluded by stating that Gumberg "covenants and agrees that rights similar to the rights herein granted by [Gumberg] to [Penney] are not held by any other tenant or occupant of space within" Quaker Village.

In addition, Penney's 1978 lease acknowledged that Gumberg had entered into a new lease with Giant Eagle to operate a food supermarket. Penney's lease provided that Penney "shall be under no duty or obligation to open [its] store for business . . . unless and until the Giant Eagle food supermarket has opened or is about to open its store for business."

The circumstances surrounding the negotiation of the 1978 lease and the language of the lease itself show that Gumberg and Penney intended to preserve and continue, in essentially the same terms, the exclusive right to operate a pharmacy which Penney acquired through the 1962 Thrift Drug lease.

The intention of the parties surrounding both leases is thus plainly expressed. As Giant Eagle's 1977 lease shows, Giant Eagle obtained the exclusive right to operate a supermarket, and received Gumberg's promise that, with the exception of the Thorofare store, such rights would not be granted to any other tenant. Gumberg granted Penney the existing pharmacy right in Penney's 1978 lease in the context of Giant Eagle's supermarket lease. Penney's intent that it have an exclusive right to operate a pharmacy is clearly expressed. While Faccenda, on behalf of

Giant Eagle, denied knowledge of Penney's exclusive right when Giant Eagle executed its lease, he also stated that exclusive-right provisions were common in shopping center leases at that time, and that there were no pharmacies in Giant Eagle's stores in 1977. In addition, Giant Eagle's counsel conceded that Giant Eagle knew that there was a 1978 lease with Penney containing exclusive-right language. These expressions of intent amply demonstrate that Gumberg and Penney intended to preserve Penney's exclusive right from the 1962 lease when they entered into the 1978 lease, and that the 1978 lease preserves and continues that preexisting exclusive right. Because Penney's 1978 lease preserves its 1962 exclusive right, we hold that Penney's exclusive right predates Giant Eagle's 1977 lease.

Both of Giant Eagle's arguments against extension of Penney's 1962 exclusive right ignore Pennsylvania law which requires us to realistically interpret shopping center leases in light of the intent of the parties under contract principles. While the 1978 lease declared the 1962 lease null and void, this provision must be read with the other provisions in the 1978 lease and the circumstances surrounding the execution of the 1978 lease. The overlap of the two leases shows that although the 1978 lease cancelled the 1962 lease, the parties expressly intended to continue the exclusive pharmacy right from the 1962 lease.

Giant Eagle's second argument is the type of traditional property-law argument which the Pennsylvania Supreme Court rejected in Teodori. 415 A.2d at 33-34. The court in Teodori decided that courts should realistically interpret shopping center leases under contract-law principles, rather than traditional property law, to give effect to the economic realities at work in shopping centers. Id. After Teodori, the intent of the parties governs the interpretation of shopping center leases and the traditional property-law restrictions on restrictive covenants and negative easements do not apply.

Thus, we conclude that the district court's finding that the exclusive provisions in the 1962 and 1978 leases "have expressly, unambiguously, and continuously since 1962" prohibited the landlord from using or permitting "the operation of any other drugstore or drug department with a registered pharmacist in attendance" was a fact not clearly erroneous, and a conclusion well drawn from the intent of the parties as expressed in the language of the leases, and in the negotiations with respect to the execution of the leases. The district court did not err in its holding that Penney had the exclusive right to operate a pharmacy at the shopping center.

## II.

Giant Eagle argues that even if Penney had an exclusive right to operate a pharmacy, it only had notice of the right by way of the 1962 lease which, by its terms, would end no later than 1993. Therefore Giant Eagle contends that to allow Penney to extend the exclusive right beyond 1993 violates the rights it acquired under its 1977 lease.

As long as Giant Eagle had notice of Penney's exclusive right when it entered into its Quaker Village lease, it is bound by

the proper interpretation of that right even though that is not the interpretation it placed on that right. 3 Milton R. Friedman, Friedman on Leases 28.601 (3d ed. 1990). Accordingly, to decide whether Penney could extend its exclusive right beyond 1993, we must again look to the parties' intent. See Sun Drug Co., 268 A.2d at 785-87 (Roberts, J., opinion in support of orders); Great Atl. & Pac. Tea Co., 220 A.2d at 5-6 (Roberts, J., dissenting).

Looking at all the leases, it is evident that Gumberg intended to grant exclusive rights to tenants operating different kinds of retail establishments. The 1962 lease with Penney's predecessor specifically warranted that Thorofare Markets, Inc. would operate a supermarket and that Triple "A" would operate a variety store. Giant Eagle's 1977 lease granted Giant Eagle the exclusive right to operate a supermarket subject to the exception recognized for the existing Thorofare store, and specifically provided that Giant Eagle's exclusive right would not cover restaurants or delicatessens. Penney's 1978 lease provided that Gumberg had entered into a lease with Giant Eagle, and provided that Penney was under no duty or obligation to open, unless and until the Giant Eagle store was about to open. It is apparent that in each lease, the tenant undertook obligations concerning its business, but also received from the lessor assurances about the other tenants within the shopping center. Such an interrelationship is recognized, particularly in the footnotes, in Justice Robert's opinion in Teodori, 415 A.2d at 34 n.5, as well as in his dissent in Great Atlantic & Pacific Tea Co., 220 A.2d at 5-6 nn.2-3.

There was just such an interrelationship between Gumberg, Penney, and Giant Eagle. Both the 1962 lease and the 1977 Giant Eagle lease provided for fixed terms, and gave the tenant the option to renew or extend for a stated number of five-year terms. Such renewals and extensions would, of course, include the exclusive rights granted to each tenant. There is no language in any of the leases, nor any testimony about the lease negotiations, indicating that any of the parties intended to restrict the parties' ability to negotiate a new lease, whether it be referred to as a renewal or extension, at the end of the lease term. Indeed, the fact that Gumberg and Penney negotiated the 1978 lease over a three-year period demonstrates that there was no such restriction.

Similarly, there is no indication in the record of any intent to restrict the landlord's ability to grant exclusive rights to tenants, as he had granted in all the earlier leases, or to strip the landlord of the ability to control the mix of the shopping center, and to grant the exclusive rights to operate specific businesses as he chose. Indeed, the evidence about the interrelationship between the landlord and the several tenants demonstrates that the parties intended to allow the landlord to negotiate continuations of existing leases, preserving their exclusive rights. If there is any difficulty in reaching this conclusion, there is nothing in the 1962 lease, the 1977 Giant Eagle lease, or the 1978 Penney lease that permits a conclusion that the parties intended to allow Giant Eagle to operate a pharmacy, a right that Gumberg had previously granted to Penney.

Giant Eagle has failed to explain why the owner of Quaker Village would limit his ability to extend or renew an exclusive right within his shopping center. Likewise, there is no reason to suspect that Thrift Drug agreed to limit its ability to extend or renew its exclusive right in the future. The 1962 lease does not state that the exclusive right cannot be extended or renewed. On the contrary, the language in the lease states that the exclusive right shall continue through any extension or renewal of the lease. When the several leases in this case are considered, it is evident that the landlord demonstrated a clear intent to control the mix of establishments in the shopping center, and that each of the tenants in entering into leases benefitted from this intent. The interrelationship between the tenants, as we have discussed, was part of the parties' underlying intent. We see nothing in any of the leases that would permit any tenant to presume that after the expiration of another tenant's lease, it would gain the right to enter into a competing business or a completely unrelated business. In light of these circumstances, we hold that the parties to the 1962 lease intended to allow extension of the exclusive right as they might see fit in the future, and that the proper interpretation of the 1962 exclusive right permits its extension. Gumberg and Penney intended Penney's 1978 lease to extend and renew Penney's 1962 exclusive right. Therefore, we also hold that Penney successfully extended its exclusive right for the duration of its 1978 lease, including any renewals. Our interpretation allowing the extension of Penney's exclusive right beyond 1993 is binding on Giant Eagle.

III.

Finally, Giant Eagle argues that it did not have notice of Penney's exclusive right when it entered into its Quaker Village lease in 1977 and, therefore, Penney cannot enforce that right against it.

Thrift Drug did not file for record the entire 1962 lease. Instead, it filed a memorandum of the lease as allowed by section 405 of title 21 of the Pennsylvania statutes. Section 407 of title 21 defines the effect of recording a lease memorandum. Section 407, which is titled "Effect of recording lease, sublease, agreement or memorandum," provides:

> The recording of any such lease, sublease, agreement or memorandum in accordance with the provisions of this act shall constitute constructive notice to subsequent purchasers, mortgagees and judgment creditors of the lessor of the making and of the provisions of such lease, sublease or agreement, including any purchase or refusal provisions set forth in the lease, sublease or agreement.

Pa. Stat. Ann. tit. 21, 407 (Supp. 1995) (emphasis added).

Giant Eagle argues that under section 407 the recording of a lease memorandum results in constructive notice only to "subsequent purchasers, mortgagees and judgment creditors of the lessor." Giant Eagle contends that it is a lessee, not a

subsequent purchaser, mortgagee or judgment creditor, and, therefore, it received no constructive notice from the recorded lease memorandum. Penney responds that Giant Eagle is a "purchaser" within the meaning of section 407 because a lease is really a sale of land for a term of years.

A close examination of section 407 shows that the legislature intended the recording of a lease memorandum to give constructive notice of the entire lease to subsequent lessees. Section 407 not only defines the effect of recording a lease memorandum, but also the effect of filing a lease, sublease or lease agreement. This is plainly reflected in the terms of section 407. If we were to accept Giant Eagle's interpretation of section 407, not even the recording of the entire lease would constitute constructive notice to a subsequent lessee. Under Giant Eagle's interpretation, there would be no way to give constructive notice of the terms of a lease to a subsequent lessee. A more reasonable interpretation of section 407 leads to the conclusion that the legislature intended the term "purchasers," as used in section 407, to include lessees. Indeed, the Supreme Court of Pennsylvania has so held. Commonwealth v. Monumental Properties, Inc., 329 A.2d 812 (Pa. 1974) (holding that a lease of real property is a sale under the Pennsylvania Consumer Protection Law). Consequently, the district court did not err in holding that Giant Eagle was at least constructively, if not actually, aware of the exclusive provision in Penney's lease.

The record before us supports this conclusion. Giant Eagle's Vice President, Faccenda, stated that while he was not involved with exclusive rights in 1977, Giant Eagle had a staff of real estate and legal people who were expected to handle these functions and to ensure that everything that Giant Eagle was doing was proper and legal. He would expect them to find a recorded document which restricted the use of the premises Giant Eagle was about to lease. He was aware when Giant Eagle moved into Quaker Village in 1977 that there was a Thrift Drug store there and that it was logical for Thrift to have a lease, but he would not have paid attention to details like exclusive rights in other leases. This testimony is sufficient to raise an inference that when Giant Eagle signed the lease in 1977 it knew of Penney's exclusive right in the 1962 lease. Also, Faccenda's knowledge that exclusive rights were common in 1977, as well as the exclusive right contained in Giant Eagle's lease, support the inference that this is a subject about which Giant Eagle and its representatives would have been interested. The record makes clear that both Penney and Giant Eagle were sophisticated lessees, and indeed were involved in some three other disputes in which Giant Eagle was seeking to enforce exclusive rights to operate pharmacies in other leases. While Giant Eagle argues that a single lessee would have no right to obtain information from a landlord about other lessees, the record is to the contrary. In Penney's letter to Gumberg's attorney on January 12, 1978, Penney requested copies of the use and exclusive-right provisions from the leases of other tenants within the shopping center. There was strong evidence in the record to support the district court's finding that Giant Eagle was constructively, if not actually, aware of the exclusive-right

provisions in Penney's leases.

We think it also follows that when Giant Eagle decided to open a pharmacy in 1990 it was bound by the exclusive rights granted to other tenants. Giant Eagle conceded that in 1977 it was not operating a pharmacy in any of its stores and its lease certainly did not give them a right to operate a pharmacy. In 1977 Giant Eagle knew of Penney's rights under the 1962 lease. From 1978, well before Giant Eagle operated pharmacies in its supermarkets and in 1990 when it decided to open a pharmacy, it had constructive notice of Penney's exclusive right as granted both in the 1978 and 1962 leases.

Accordingly, we affirm the order of the district court granting the permanent injunction.

J.C. PENNEY COMPANY, INC. V. GIANT EAGLE, INC., ET AL.
No. 95-3054


STAPLETON, J., dissenting:

I respectfully dissent.

I start with the proposition that restrictive covenants in prior conveyances are binding only against future lessees with actual or constructive notice before the lease is signed. See Finley v. Glenn, 154 A. 299, 301 (Pa. 1931); see generally 3 M. Friedman, Friedman on Leases 28.601 (3d ed. 1990). J.C. Penney's lease agreement thus will not support the district court's injunction in the absence of actual or constructive notice to Giant Eagle.

I believe the record contains insufficient evidence to permit a finding that Giant Eagle had actual notice of J.C. Penney's exclusive when Giant Eagle signed its lease in 1977. In any event, as the court acknowledges, the district court made no finding that Giant Eagle had actual notice at that time. Based on the particular facts of this case, however, we may assume, arguendo, that Giant Eagle had actual notice of the exclusive in 1977. We may also assume, without deciding, that 21 Pa. Stat. Ann. 407 applies here and that Giant Eagle had constructive notice in 1977 of the existence and provisions of J.C. Penney's 1962 lease, including the restrictive covenant. Finally, we may also assume without deciding that J.C. Penney's 1978 lease effectively continued the 1962 pharmacy exclusive in the new location within the shopping center--that is, that the restrictive covenant runs with the restricted land retained by the landlord (the entire shopping center), not with the premises originally leased by J.C. Penney in 1962. Thus, had J.C. Penney merely moved to a new storefront within the shopping center in 1978 but otherwise retained all the provisions of the 1962 lease, including the original term and renewal rights provisions, we may assume that Giant Eagle could have been bound by the restrictive covenant for the maximum 30-year term of the 1962 lease.

While the 1978 lease alone, independently of the 1962 lease, may bind co-tenants who signed leases after 1978, it cannot bind a pre-existing tenant such as Giant Eagle. The critical issue, then, is whether J.C. Penney's 1978 lease could operate as

an extension of the restrictive covenant in the 1962 lease beyond its original maximum term of 30 years.

In 1977, Giant Eagle had notice that J.C. Penney's 1962 lease would expire, at the latest, 30 years from its effective date, or August 31, 1993. Giant Eagle cannot be bound by any extension of the restrictive covenant beyond that date because J.C. Penney's lease did not include any such extension right at the time Giant Eagle signed its lease.

Pennsylvania's lease recording statute explicitly requires that a memorandum of lease must contain the expiration date of the final period for any right of extension or renewal. 21 Pa. Stat. Ann. 405. Notice of the maximum term of a lease is important because the term partly defines or circumscribes the rights of a purchaser, mortgagee, or judgment creditor--or, as I have assumed, a tenant to be bound by a co-tenant's restrictive covenant. A purchaser with notice of a recorded lease takes the property subject to that lease only for the maximum term; that is, the purchaser has bought the right to hold the property free of the leasehold interest after the final expiration date indicated in the recorded lease agreement. Similarly, a tenant who enters into a shopping center lease agreement, with at least constructive notice of a co-tenant's lease containing a restrictive covenant, has bought the right to be free from the restrictive covenant at the expiration of the co-tenant's lease as recorded.

Allowing a tenant to extend a binding restrictive covenant by merely extending the term of its lease beyond the original, maximum term would operate to bind a co-tenant to a restrictive covenant for a period of time during which the co-tenant had no notice it could be bound. There is no principled difference between binding a co-tenant to such an extension and binding a co-tenant to a restrictive covenant of which it had no notice at all in the first instance: either way, a co-tenant's property rights are more restricted than they were disclosed to be at the time the co-tenant entered into its lease agreement.

Giant Eagle signed its lease in 1977, half-way through the maximum 30-year term of J.C. Penney's 1962 lease, with notice that J.C. Penney's pharmacy exclusive would prohibit Giant Eagle from operating a pharmacy until 1993 at the latest. The district court's holding necessarily implies that Giant Eagle had no right to expect, in 1977, that it could operate a pharmacy department after 1993 for the remaining 24 years of its lease. In other words, the district court's rule would have given J.C. Penney and the landlord the right at any time prior to 1993 to decide between themselves to bind Giant Eagle to an extension of the restrictive covenant without obtaining Giant Eagle's consent. Such a rule cannot be correct because it operates retroactively to restrict a tenant's property rights under its lease agreement.

I would accordingly decide that, at least with respect to pre-existing tenants such as Giant Eagle, J.C. Penney's 1978 lease did not extend the pharmacy exclusive beyond the expiration of the maximum term of the 1962 lease on August 31, 1993. We may assume that Giant Eagle was thus in violation of the restrictive covenant when it opened its pharmacy department in August 1992, and when the district court granted J.C. Penney's motion for a preliminary

injunction the following month.  However, by the time the district court ordered permanent injunctive relief in January 1995, J.C. Penney's exclusive was no longer binding against Giant Eagle. J.C. Penney's exclusive, therefore, cannot be a basis for affirming the permanent injunction.  I would reverse the judgment of the district court, thereby vacating the permanent injunction.